Yeoshua SORIAS and Zilicon
Accessories LLC,
Plaintiffs,

v.

NATIONAL CELLULAR USA, INC.,
Mark Grossman, Zeev Grossman,
David Grossman, Yishai Z. Pliner,
Lloyd Gladstone, Prong, LLC, and
John Does 1–10, Defendants.

No. 14–CV–2897 (WFK)(SMG).

United States District Court,
E.D. New York.

Signed Aug. 27, 2015.

246

Sam Peter Israel, Timothy L. Foster, Sam P. Israel P.C., New York, NY, for Plaintiffs.

Charles E. Dorkey, III, Dentons U.S. LLP, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

WILLIAM F. KUNTZ, II, District Judge:

This is a patent infringement case involving various designs for phone chargers that can be attached to the back of cell phones. Plaintiffs Yeoshua Sorias and Zilicon Accessories LLC (collectively, "Plaintiffs") bring claims of patent infringement, and violation of trade secrets and unfair competition against Defendants Yishai Z. Pliner, Lloyd Gladstone, and Prong, LLC (collectively, "the Prong Defendants"). Plaintiffs also bring claims of patent infringement, breach of contract, rescission of license agreement, and violation of trade secrets and unfair competition against Defendants National Cellular USA, Inc., Mark Grossman, Zeev Grossman, and David Grossman (collectively, "the NC Defendants"). Dkt. 89 (Fourth Amended Complaint) ("Complaint"). On August 20, 2015, the NC Defendants filed a motion to dismiss the Complaint, arguing it fails to state a federal claim for either provisional patent right infringement or trade secret misappropriation, and Plaintiff's trade secret claim is barred by the statute of limi-

tations. Dkt. 113–1 ("NC Mot.") at 8–25; Dkt. 113–5 ("NC Reply") at 1–10. On August 21, 2015, the Prong Defendants filed a motion to dismiss or, alternatively, for summary judgment arguing the Complaint fails to plead patent infringement, summary judgment of non-infringement of Plaintiffs design patent is proper as there are no material facts in dispute, the Complaint fails to plead trade secret misappropriation and unfair competition, Plaintiff's trade secret and unfair competition claims should be dismissed as time barred, and the Prong Defendants are improperly joined in this action. Dkt. 115–1 ("Prong Mot.") at 10–20; Dkt. 115–11 ("Prong Reply") at 1–10. For the following reasons, the NC Defendants' motion is GRANTED IN PART and DENIED IN PART and the Prong Defendants' motion is GRANTED IN PART and DENIED IN PART.

### BACKGROUND

**The Parties**

Plaintiff Yeoshua Sorias ("Sorias") is an inventor and patent owner of various electronic devices and accessories as well as a founder, principal, and officer of Plaintiff Zilicon Accessories, LLC ("Zilicon"), which is a New York limited liability company that "engages in designing and manufacturing innovative wireless and electronic devices." Complaint at ¶¶ 7–8, 21.

Defendant National Cellular USA, Inc. ("NC") is a New York corporation "engaged in the production [and] marketing of cell phone accessories[.]" Id. at ¶ 9. Defendants Mark, Zeev, and David Grossman (collectively, "the Grossmans") are brothers who live in New York, and are principals and officers of NC who "jointly run all the affairs and make all of the key decisions relative to the business of" NC. Id. at ¶¶ 10–13.

Defendant Prong, LLC (n/k/a Prong., Inc.) ("Prong") is a Delaware limited liability company headquartered in New York which "produces, markets, and sells cell phone cases with integrated A/C charging plugs to U.S. consumers throughout the country and abroad." *Id.* at ¶ 14. Defendants Yishai Z. Pliner ("Pliner") and Lloyd Gladstone ("Gladstone") are both principals and officers of Prong who "jointly run the affairs and make all of the key decisions relative to the business of" Prong. *Id.* at ¶¶ 15–17.

**Factual Background**

In 2010, Plaintiffs allege Sorias invented the *Detachably Integrated Battery Charger For Mobile Cell Phones and Like Devices*, which is a cell phone case that doubles as a charger. *Id.* at ¶ 23. Specifically, Sorias' product comprises "a charger that can be kept attached to the backside of the phone as a case, with A/C prongs folding in and out in opposite directions, and merging horizontally onto the back of the charger, flush with the case." *Id.* Plaintiffs allege this design differed from those of other cell phone cases on the market because of the "unique arrangement of specially-made electronic components and the A/C prongs folding in and out horizontally (thus adding almost no additional thickness to the case)." *Id.* at ¶ 24.

On January 12, 2011, Sorias filed a provisional patent application (No. 61/432,050) with the United States Patent and Trademark Office ("USPTO"). *Id.* at ¶ 26. From the filing of the provisional patent application until the publication of the patent application, Plaintiffs allege "Sorias carefully safeguarded the proprietary nature of his intellectual property," including requiring all potential investors to sign non-disclosure agreements. *Id.* at ¶¶ 29–30, 62.

On or about January 13, 2011, Plaintiffs allege Sorias met with the Grossmans and other NC investors to discuss a potential partnership or licensing deal. *Id.* at ¶ 34. Plaintiffs allege the Grossmans signed a non-disclosure agreement, after which Sorias presented them with the materials and information included in the provisional patent application. *Id.* Sorias also provided the Grossmans with a prototype phone cover. *Id.* at ¶ 35. According to Plaintiffs, the Grossmans "immediately offered a 50% partnership with NC." *Id.* at ¶ 36.

On or about April 7, 2011, Plaintiffs allege Sorias received a letter of intent ("LOI") from the Grossmans for NC to have the exclusive right to manufacture and sell Sorias' charger, "provided that NC produce working samples of the charger within three months of the LOI's execution." *Id.* at ¶ 37. If NC could not produce the samples within the three month time period, Sorias would be free to pursue other options. *Id.* NC, however, would continue to be bound by the non-disclosure agreement. *Id.*

On or about July 7, 2011, three months after the LOI was executed, Plaintiffs allege Sorias asked for the promised samples. *Id.* at ¶ 38. Plaintiffs allege the Grossmans informed Sorias they had been unable to engineer the charger as designed, but convinced Sorias to give them more time. *Id.*

In August 2011, Plaintiffs allege the Grossmans provided Sorias with a blueprint of a charger which had a thickness of approximately 16 millimeters ("mm"). *Id.* at ¶¶ 39–40. Plaintiffs allege NC represented the charger could not be made thinner, while Sorias insisted he could make a charger with a thickness of less than 16 mm. *Id.* at ¶ 41. Plaintiffs allege Sorias then advised the Grossmans that the deal was off as they had not timely met the requirements of the LOI. *Id.* Plaintiffs also

allege that upon termination of the deal, "the Grossmans retaliated by threatening to disclose [the information protected by the nondisclosure agreement] to third parties[,]" and "further insisted that if Sorias failed to cooperate with NC, NC would simply make and sell the device without him." *Id.* at ¶ 42.

In the fall of 2011, Plaintiffs allege Sorias "instituted against the NC Defendants an arbitration session conducted by a rabbi in their community." *Id.* at ¶ 43. Plaintiffs allege the Grossmans failed to attend the first arbitration session. *Id.*

Prior to a second arbitration session, Plaintiffs allege NC contacted Sorias with a compromise—each party would receive different rights to make the charger-case based upon NC's representation that the charger case could not be made thinner than 16 mm and Sorias' representation that it could be made thinner. *Id.* at ¶ 44.

On or before December 22, 2011, Plaintiffs allege Sorias and the Grossmans reached an agreement ("the License Agreement") pursuant to which NC could manufacture and sell chargers with a thickness of 16mm or greater while paying Sorias a royalty, and Sorias could make and sell chargers with a thickness below 16 mm until December 2018. *Id.* at ¶¶ 45–47. The License Agreement also provided NC would provide Sorias with at least three samples of a first production run of their charger within 180 days of the signing of the License Agreement. *Id.* at ¶ 48.

On June 20, 2012, after the 180–day period had expired, Plaintiffs allege Sorias went to NC's offices to request the three production samples. *Id.* at ¶ 49. Plaintiffs allege the NC Defendants provided Sorias with three hard samples, not production samples, of which Sorias was permitted to retain two though he was not given tools to conduct any testing or measurements during the meeting. *Id.* at ¶ 52. Plaintiffs

allege the NC Defendants asked Sorias to sign a letter indicating he had seen three production samples even though Plaintiffs allege no such samples were provided, and Plaintiffs further allege that the NC Defendants provided no information to Sorias about production or manufacturers. *Id.* at ¶¶ 49–50. Nonetheless, Plaintiffs allege Sorias signed the letter indicating he had seen three production samples. *Id.* at ¶ 51.

After June 20, 2012, Plaintiffs allege Sorias measured the two hard samples he had been given by the NC Defendants and found they had a thickness of less than 16 mm. *Id.* at ¶ 53. Plaintiffs allege the NC Defendants now argue the 16 mm thickness in the License Agreement referred to the overall thickness of the charger case with the mobile phone rather than the thickness of the charger case alone. *Id.* at ¶ 54. Plaintiffs contest this characterization of the terms of the License Agreement. *Id.* at ¶ 55.

At some point after June 2012, Plaintiffs allege Sorias informed the NC Defendants that they were in breach of the License Agreement. *Id.* at ¶ 53. Plaintiffs allege the NC Defendants also violated the nondisclosure agreement they signed by failing to protect the information provided to them in confidence and by providing the confidential information to "potential competitors of Zilicon, including Prong." *Id.* at ¶¶ 61–65. Plaintiffs further allege the NC Defendants continue to manufacture and sell a phone charger using the information provided to them by Sorias that was in the provisional patent application. *Id.* at ¶ 56. In addition, Plaintiffs also allege the NC Defendants marketed their phone charger to Apple, Inc. and "even filed a competing patent application." *Id.* at ¶ 57.

On July 12, 2012 ("the Publication Date"), Sorias' provisional patent application was published and became public. *Id.* at ¶ 30.

Plaintiffs allege the NC Defendants continued to market and sell their "contractually-barred mobile phone charger" after the Publication Date until December 2013, including by selling and distributing a phone charger that incorporated technology described in the provisional patent application to Apple, Inc. and other retailers of mobile phone chargers. *Id.* at ¶¶ 58–60.

In or around September 2013, Plaintiffs allege Pliner called Sorias to congratulate him on the pending approval of his patent and to offer "to meet to discuss a potential partnership with Prong[.]" *Id.* at ¶ 68.

In or about October 2013, Plaintiffs allege Sorias met with Pliner and Gladstone to discuss a possible royalty deal, partnership, or the outright purchase of Sorias' prospective patent by Prong. *Id.* at ¶ 69. Plaintiffs allege "Pliner acknowledged that once Sorias' patent was issued Prong would be infringing if it continued to make, offer for sale[,] and sell the [charger it was currently selling]." *Id.* Negotiations between Plaintiffs and the Prong Defendants subsequently fell apart. *Id.* at ¶¶ 70–71.

On April 29, 2014, the USPTO granted U.S. Patent No. 8,712,486 ("the '486 Patent") for the *Detachably Integrated Battery Charger For Mobile Cell Phones and Like Devices,* which names Sorias as the inventor. *Id.* at ¶¶ 25, 27. Sorias owns all rights, title and interest in and to the '486 Patent; Zilicon holds an exclusive license to manufacture and sell the patented design. *Id.* at ¶¶ 27–28.

Plaintiffs allege the Prong Defendants continue to make, offer for sale, and sell "a mobile phone charger with horizontally-folding A/C prongs that was the same as Sorias' device protected under the '486

Patent" ("the Prong Charger"). *Id.* at ¶ 71. Plaintiffs allege the Prong Defendants continued to sell the Prong Charger via Kickstarter (an effort which began in March 2012) after the grant of the '486 Patent, as well as currently selling the Prong Charger on their own website, Amazon.com, and Indiegogo. *Id.* at ¶¶ 72–76.

On March 3, 2015, during the pendency of this litigation, the USPTO granted U.S. Patent No. D723, 457 S ("the '457 Design Patent") to Sorias; the '457 Design Patent is a "design patent for the ornamental design for a phone charger, as depicted in the '486 Patent." *Id.* at ¶ 31 (internal quotation marks omitted); *see also* Dkt. 89–3 ("'457 Design Patent").

**Procedural History**

On April 10, 2015, Plaintiffs filed the operative Complaint in this action, alleging claims of (1) patent infringement, and (2) violation of trade secrets and unfair competition against the Prong Defendants as well as claims of (1) patent infringement, (2) breach of contract, (3) rescission of license agreement, and (4) violation of trade secrets and unfair competition against the NC Defendants, Complaint.

On August 20, 2015, the NC Defendants filed a motion to dismiss the Complaint, arguing (1) the Complaint fails to state a federal claim for either provisional patent right infringement or trade secret misappropriation against the NC Defendants, (2) Plaintiff's trade secret claim is barred by the statute of limitations, and (3) the Court should decline to exercise jurisdiction over the state law claims. NC Mot. at 8–25; NC Reply at 1–10. The NC Defendants also requested the Court clarify that the dismissal of the Third Amended Complaint was with prejudice. NC Mot. at 24–25; NC Reply at 10.

On August 21, 2015, the Prong Defendants filed a motion to dismiss or, alterna-

tively, for summary judgment, arguing (1) the Complaint fails to plead patent infringement, (2) summary judgment of non-infringement of the '457 Design Patent is proper as there are no material facts in dispute, (3) the Complaint fails to plead trade secret misappropriation and unfair competition, and (4) Plaintiff's trade secret and unfair competition claims should be dismissed as time barred. Prong Mot. at 10–20; Prong Reply at 1–10. The Prong Defendants also requested the case against them be severed from that against the NC Defendants. Prong Mot. at 19–20.

For the reasons set forth below, the NC Defendants' motion is GRANTED IN PART and DENIED IN PART and the Prong Defendants' motion is GRANTED IN PART and DENIED IN PART.

## DISCUSSION

### I. Legal Standard

#### A. Motion to Dismiss

To survive a motion to dismiss under Federal Rules for Civil Procedure Rule 12(b)(6), each claim must set forth sufficient factual allegations, accepted as true, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation and quotation marks omitted). In applying this standard, the Court is guided by "[t]wo working principles." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). First, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the plaintiff's] favor." *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir.2009) (per curiam) (citations omitted). However, the Court need not credit "legal conclusions" in a claim or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Harris*, 572

F.3d at 72 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937) (internal quotation marks and alteration omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss," and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937) (internal quotation marks omitted).

#### B. Motion for Summary Judgment

A court appropriately grants summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). No genuine issue of material fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir.2001) (quoting *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The moving party must meet its burden by pointing to evidence in the record, including depositions, documents, affidavits, or other materials which demonstrate the absence of a genuine issue of material fact. *See* Fed. R.Civ.P. 56(c)(1)(A), (2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In determining whether summary judgment is appropriate, [the] Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.2011) (internal quotation marks and citations omitted). The role of the district court is not to weigh the evidence and determine the truth of the mat-

ter, but rather to perform "the threshold inquiry of whether there is the need for a trial[.]" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the moving party fulfills its preliminary burden, the burden shifts to the non-movant to raise the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(c)(1). Statements devoid of specifics and evidence that is merely colorable are insufficient to defeat a properly supported motion for summary judgment. *See Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999); *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (citing *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)).

## II. Analysis

The Court will address the parties' claims in the following order: (1) Prong Defendants' motion to dismiss/ motion for summary judgment of non-infringement; (2) NC Defendants' motion to dismiss Plaintiff's claim for Provisional Rights under 35 U.S.C. § 154(d); (3) both groups of Defendants' motions to dismiss the claims of trade secret misappropriation and unfair competition; (4) NC Defendants' state law claims, and (5) Prong Defendants' motion to dismiss for improper joinder.

### A. Patent Infringement Claim against Prong Defendants

The Prong Defendants argue Plaintiffs patent infringement claim for the '486 Patent and the '457 Design Patent against them fails to state a claim because it is inadequately pleaded or, in the alternative, that summary judgment of non-infringe-

ment of the '457 Design Patent is appropriate because there are no material facts in dispute. Prong Mot. at 10–17. The Court will first address the motion to dismiss and then the motion for summary judgment.

### 1. Patent Infringement Claims Survive the Motion to Dismiss

■ The Prong Defendants argue the patent infringement claim must be dismissed for failure to state a claim because "it fails to apprise [the Prong Defendants] as to what is alleged to infringe [the '486 Patent and the '457 Design Patent] and the grounds upon which the claim rests." Prong Mot. at 10 (internal quotation marks and brackets omitted).

"The Federal Circuit has found that the adequacy of a pleading of direct infringement is measured by the specificity required in Form 18 of the Federal Rules of Civil Procedure." *Joao Control & Monitoring Sys., LLC v. Slomin's Inc.,* 14–CV–2598, 2015 WL 77516, at *1 (E.D.N.Y. Jan. 6, 2015) (Gleeson, J.) (citations omitted). "To comply with the requirements of Form 18, a plaintiff must include:

(1) an allegation of jurisdiction; (2) a statement that the plaintiff owns the patent; (3) a statement that defendant has been infringing the patent 'by making, selling, and using the device embodying the patent'; (4) a statement that the plaintiff has given the defendant notice of its infringement; and (5) a demand for an injunction and damages."

*Id.* at *2 (citations omitted).

The Complaint meets the requirements of Form 18, alleging jurisdiction in paragraphs 18 and 19, patent ownership in paragraphs 27 and 31, infringement by the Prong Defendants in paragraph 82, notice of infringement in paragraphs 69 and 79, and demanding an injunction and damages on page 21 at paragraphs (a) and (b). Complaint at ¶¶ 18, 19, 27, 31, 69, 79, 82,

pg. 21(a) and (b). Further, the Complaint describes the specific chargers made by the Prong Defendants which Plaintiffs allege infringe the '457 Design Patent and the '486 Patent, namely the charger depicted on the Prong Defendants' Kickstarter page and on their more recent Indiegogo page, and identifies the "Prong Charger" as "a mobile phone charger with horizontally-folding A/C prongs that was the same as [Plaintiffs'] device protected under the '486 [P]atent." *Id.* at ¶¶ 66, 71, 73.

Accordingly, the Court finds the Complaint adequately states a cause of action for patent infringement of the '486 Patent and the '457 Design Patent against the Prong Defendants. The Prong Defendants' motion to dismiss the patent infringement claim is accordingly DENIED.

### 2. Accused Prong Products Do Not Infringe the '457 Design Patent [1]

■ The Prong Defendants next argue summary judgment of non-infringement of the '457 Design Patent is appropriate because (1) the '457 Design Patent Claim "does not include the prongs, the location of prongs offset from the center, or the prior art" and (2) the ordinary observer would not purchase and use either the patented design or the Prong Defendants' chargers while believing one to be the other. Prong Mot. at 12–17.

■ "Determining whether a design patent is infringed is a two-step process. First, the court must construe the design

patent's claim." *Hutzler Mfg. Co., Inc. v. Bradshaw Int'l, Inc.,* 11–CV7211, 2012 WL 3031150, at *4 (S.D.N.Y. July 25, 2012) (Gardephe, J.) (internal quotation marks and citation omitted). "The second step in determining whether a design patent is infringed require[s] the fact-finder to compare the patented and accused designs to determine whether the accused design is substantially similar in appearance to the patented design." *Id.* at *5 (internal quotation marks and citation omitted). "In making that determination, courts utilize the 'ordinary observer' test[.]" *Id.* The Court will address each step in turn.

### a. Claim Construction of '457 Design Patent

■ "In construing a patent design claim [at step one], the focus is on overall appearance and the visual impression it creates." *Id.* at *4 (internal quotation marks and citations omitted). "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *Id.* (internal quotation marks and citations omitted). The Federal Circuit has made clear that, in construing design patents, district courts generally should forego verbal description:

> "Given the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by

---

1. The Prong Defendants also move for summary judgment on the basis that the '486 Patent is unenforceable. *See* Prong Mot. at 17. This argument was made in a separate motion to the Court. Dkt. 92 ("SJ Motion of Unenforceability"). Due to an overlapping briefing schedule for the unenforceability motion and the current motions, the Prong Defendants incorporated the unenforceability motion into the current motion as well. *See* Prong Mot. at 17. However, he Prong Defendants' motion for summary judgement of unenforceability was denied by the Court on June 15, 2015 and will not be addressed again. *See* Dkt. 101 (Order Denying Summary Judgment of Unenforceability); Prong Reply at 1.

providing a detailed verbal description of the claimed design."

*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed.Cir.2008). Instead, "[a]s a rule the illustration in the drawing views is its own best description." *Hutzler Mfg. Co., Inc.*, 2012 WL 3031150 at *5 (internal quotation marks and citation omitted). "Accordingly, district courts following *Egyptian Goddess* have generally relied on patent drawings to construe design claims." *Id.* (internal quotation marks and citations omitted).

"Here, the Court finds that the claims articulated in [the '457 Design Patent] are unambiguous and are clearly illustrated by the figures contained therein." *Id.* (internal quotation marks and citations omitted). "In accordance with *Egyptian Goddess*, 543 F.3d at 679, this Court will not provide a detailed verbal description of the ['457 Design Patent] and will rely instead on the illustrations set out [therein]." *Id.* The Court construes the Plaintiffs' claims as the ornamental design for a cell phone case with foldable A/C prongs in the center of the back of the case and no case material on the top of bottom of the cell phone as shown in Figures 1, 2, 3, 4, and 5 of the '457 Design Patent. *See* '457 Design Patent at Figs. 1–5.

### b. Ordinary Observer Test

■ The 'ordinary observer' test has been described by the Federal Circuit as being the following:

If, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Hutzler Mfg. Co., Inc.*, 2012 WL 3031150 at *5–6 (internal quotation marks omitted) (citing *Egyptian Goddess*, 543 F.3d at 670).

"The notional ordinary observer is ... someone who—while not an expert in the product—is not entirely ignorant of it, and indeed has some degree of familiarity with it. The 'ordinary observer' thus includes someone who has purchased, or shopped for, a like item in the past." *Id.* at *6 (internal citations omitted) (collecting cases). The Court therefore finds the relevant 'ordinary observer' here is one who has seen, shopped for, or purchased a cell phone charger of similar design. *See id.*

The ordinary observer test also requires the ordinary observer to give the item "such attention as a purchaser usually gives[.]" *Id.* at *5 (internal quotation marks omitted) (citing *Egyptian Goddess*, 543 F.3d at 670). "In considering the degree of attention a typical consumer is likely to bring to a purchase, it is reasonable to assume that consumers will bring greater attention to an expensive purchase, and give less attention where the cost is inconsequential." *Id.* at *7 (collecting cases).

■ "In determining whether two designs are 'substantially the same,' courts focus on the overall impression given by the claimed design, rather than particular ornamental details or minutiae." *Id.* at *8 (collecting cases). "Consistent with this approach, courts give significant attention to the lines and overall shape of the designs at issue." *Id.* at *9 (collecting cases). Further, "[t]he Federal Circuit has ... regularly engaged in side-by-side comparisons of patented and accused designs in order to determine whether they are 'substantially the same.'" *Id.* at *10 (collecting cases). "A long line of cases counsels that, in performing side-by-side comparison, courts generally should compare the design set forth in the patent—that is, the drawings—with the accused product, rather than comparing the embodiment of the

patented design and the accused product." *Id.* at *10 (collecting cases).

Ultimately, while "[p]atent infringement can be found for a design that is not identical to the patented design[,]" "[i]n practice ... the cases in which the Federal Circuit has sustained a finding of infringement have involved a very high degree of similarity." *Id.* at *11 (collecting cases).

In arguing the accused Prong chargers does not infringe the '457 Design Patent, the Prong Defendants rely primarily on the different locations of the plugs in the '457 Design Patent and the accused product, the fact that the accused products have a cut-out for the cell phone camera lens while the '457 Design Patent drawings provide for no such cut-out, and the lack of top and bottom protection on the '457 Design Patent drawings as compared to the top and bottom coverage provided for by the accused products. Prong Mot. at 14–17; *see also* Dkt. 115–4 ("Gladstone Decl.") at 2–3 (photos of the accused products). The Prong Defendants are correct.

As noted above, the "ordinary observer" in this case is one who has seen, shopped for, or purchased a cell phone charger of similar design. Further, cell phone cases do not run cheap, nor do the smart phones they are designed to protect. It is therefore likely that an "ordinary observer" is likely to spend some time considering the cell phone cover he or she plans to purchase for both its protective as well as aesthetic value. In addition, an "ordinary observer" would likely check to make sure the cell phone cover allows for use of all of the features of his or her phone.

The cost and purpose of a cell phone cover reinforce the argument that a cell phone case without a cut-out for the cell phone camera lens and without protection for the top and bottom of a cell phone is not likely to be mistaken for a cell phone case with a cut-out for the cell phone camera lens and with substantial protection on the top and bottom of the cell phone. The '457 Design Patent protects from infringement the former design; the accused Prong products embody the latter. *Compare* '457 Design Patent at Figs 1–5 (indicating a sleeve-like form with no top or bottom and with a full coverage back) *with* Gladstone Deck at 2–3 (pictures of accused Prong products depicting protection on top and bottom of phone and the cell phone camera lens cut-out on all models in varying fashions). Certainly the lack of a cut-out for a cell phone camera lens negatively affects the functionality of cell phones as they are used by ordinary purchasers who will likely want to take pictures to share on Facebook, Instagram, and the like. Further, the predominant purpose of a cell phone case is safety, so it is reasonable to believe an ordinary observer would specifically notice and consider the all-around safety features of a particular design of cell phone cover, or lack thereof, when determining which one to purchase.

The Court's finding that an ordinary observer would not buy one of the accused Prong products believing it to be the product depicted in the '457 Design Patent is further supported by the differing locations of the foldable A/C prongs. *Compare* '457 Design Patent at Figs 1–5 (indicating foldable prongs in the center of the back of the case) *with* Gladstone Deck at 2–3 (depicting foldable prongs in the bottom third to bottom quarter of the back of the case). The Prong Defendants point out that they advertise as one of the advantages of their design that the "prongs are located so as to avoid obstructing the second, adjacent wall outlet." Prong Mot. at 15, *see also* Gladstone Decl. at ¶ 10. Given the cost of cell phone covers and their safety functionality, a purchaser has motivation to pay attention to differences

such as this one. *Cf. Hutzler Mfg. Co., Inc.*, 2012 WL 3031150 at *15 (noting a purchaser of inexpensive items has little motivation to pay attention to subtle differences). Further, an individual purchasing a cell phone cover with foldable A/C prongs is likely doing so with concerns about the ease of charging the phone in mind. It follows, therefore, that prong location and its relationship to the question of ease of charging the phone is likely to be something an "ordinary observer" of a product protected by the '457 Design Patent would take into account.

Ultimately, the differences in design between the accused Prong products and the '457 Design Patent outweigh their similarities and are not so close as to confuse an "ordinary observer" into purchasing one while believing it to be the other. Accordingly, the Court GRANTS the Prong Defendants' motion for summary judgment of non-infringement of the '457 Design Patent.

## B. Failure to State a Claim for Provisional Rights Under 35 U.S.C. § 154(d)

■ The NC Defendants argue dismissal of Plaintiffs' claim for provisional rights under 35 U.S.C. § 154(d) should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) because the Complaint alleges neither (1) actual notice of the published application nor (2) substantial identity of the NC Defendants' product to the invention as claimed by the '486 Patent. NC Mot. at 8–9; NC Reply at 1–3. Plaintiffs' respond they held provisional rights under 35 U.S.C. § 154(d) from the Publication Date of July 12, 2012 until the '486 Patent was granted on April 29, 2014, and that the NC Defendants owe them compensation for their infringement during that period. Dkt. 113–3 ("Opp.") at 17–20. The Court

finds the Complaint fails to allege that the NC Defendants received actual notice of the published patent application and accordingly GRANTS the NC Defendants' motion to dismiss this claim.

■ "Provisional rights allow an inventor to recover royalties for infringing conduct occurring during the period after publication of a patent application but prior to the patent's issuance." *Baseball Quick, LLC v. MLB Advanced Media L.P.*, 11–CV–1735, 2014 WL 3728623, at *11 (S.D.N.Y. July 25, 2014) (Forrest, J.) (internal quotation marks and citation omitted). 35 U.S.C. § 154(d) provides in pertinent part that "a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent ... and ending on the date the patent is issued— ... had actual notice of the published patent application[.]" 35 U.S.C. § 154(d)(1) & (d)(1)(B); *see also Baseball Quick, LLC*, 2014 WL 3728623 at *11 n. 6. In addition to actual notice, the statute also requires "the invention as claimed in the patent [to be] substantially identical to the invention as claimed in the published patent application[,]" 35 U.S.C. § 154(d)(2). These requirements are strict "[s]ince provisional rights extend back to the initial patent application[,]" thereby providing for a potentially significant recovery. *See Baseball Quick, LLC*, 2014 WL 3728623 at *11; *see also Rosebud LMS, Inc. v. Adobe Sys., Inc.*, 14–CV–194, 2015 WL 510256, at *3 (D.Del. Feb. 5, 2015) (Robinson, J.) (noting Section 154(d) provides an "extraordinary remedy"). As such, a patent holder must meet two requirements to receive the reasonable royalty provided under 35 U.S.C. § 154(d): actual notice and substantial identity. *See Stephens v. Tech Int'l. Inc.*, 393 F.3d 1269, 1275 (Fed Cir.2004). If either is missing, a reasonable royalty will

not be awarded. *See, e.g., King Instruments Corp. v. Perego,* 65 F.3d 941, 959 (Fed.Cir.1995) (noting actual notice is a prerequisite to a reasonable royalty award).

■ Actual notice is required even for "deliberate infringers who clearly can foresee legal injury[ ]" and "[f]ailure to provide such notice cuts off a patentee's recovery of damages until actual notice of infringement is given." *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1571 (Fed.Cir.1995) (internal quotation marks and citation omitted). This is because "[i]t is well settled that a potential infringer having actual notice of another's patent rights had an affirmative duty of due care ... [which] will normally entail the obtaining of competent legal advice before engaging in any potentially infringing activity or continuing such activity." *Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1084 (Fed.Cir. 1987). Accordingly, the actual notice requirement is a serious one. *See, e.g., Rosebud LMS, Inc.,* 2015 WL 510256 at *3 (finding constructive notice does not suffice for the actual notice requirement of Section 154). For example, the Federal Circuit has affirmed that a letter "providing Section 154 notice[,]" *i.e.* a letter which "represented [the patent holder's] adherence to Section 154's requirement that [the possible infringer] be placed on notice of the [holder's] future right to obtain royalties if a patent issued in a form substantially identical to the published [patent] application[,]" meets the standard for actual notice. *Stephens v. Tech Int'l Inc.,* 393 F.3d 1269, 1276 (Fed.Cir.2004). The Federal Circuit has not explicitly found a less clear form of notice satisfies the strict actual notice standard, and it is evident from the text of the statute and past cases that constructive notice will not suffice.

Regarding actual notice, the NC Defendants argue the Complaint does not allege they had actual notice of Plaintiff's published patent application between July 12, 2012 and April 29, 2014. NC Mot. at 8. In response, Plaintiff argue it is "obvious" the NC Defendants had actual notice of the published patent application from "the business relationship alleged in the [Complaint.]" *Opp.* at 19 (citing Complaint at ¶¶ 91–92). The Complaint, however, indicates only that the NC Defendants had notice of "materials and information included in" Plaintiff's patent application in January 2011 and notice in approximately June 2012 that Plaintiffs believed the NC Defendants had infringed the License Agreement the parties entered into in December 2011 by manufacturing a charger with a thickness of less than 16 mm. Complaint at ¶¶ 34, 45, 53–56, 59–60, 91–96. Nowhere does the Complaint allege Plaintiffs provided the NC Defendants with actual notice of the *published* patent application after its Publication Date of July 12, 2012. This is what is required by the statute, even in the case of deliberate infringers, in order for a Plaintiff to achieve the "extraordinary remedy" of damages from the date of the publication patent application, instead of from the issuance of the patent itself. *See Rosebud LMS, Inc.,* 2015 WL 510256 at *3; *see also Rite–Hite Corp.,* 56 F.3d at 1571. Plaintiffs allege numerous communications between NC Defendants and themselves regarding the License Agreement and the NC Defendants' charger, but in none of these communications do Plaintiffs allege they even mentioned the published patent application. *See, e.g.,* Complaint at ¶¶ 53–56. Allegations that the NC Defendants received materials from a preliminary patent application and then may have breached the License Agreement such that they *should have known* about the published patent application do not constitute allega-

tions of actual, rather than constructive, notice. *See Rite–Hite Corp.*, 56 F.3d at 1571. Accordingly, the Court finds the Complaint fails to allege that the NC Defendants received actual notice of the published patent application.

35 U.S.C. § 154(d) requires both actual notice and substantial identity. Lack of actual notice precludes recovery under the statute. *See, e.g., King Instruments Corp.*, 65 F.3d at 959 (noting actual notice is a prerequisite to a reasonable royalty award). The Court, therefore, need not decide whether Plaintiffs have sufficiently alleged substantial identity between the published patent application and the '486 Patent because the failure of Plaintiffs to plead actual notice requires dismissal of Plaintiffs' claim for provisional rights. Accordingly, the Court GRANTS the NC Defendants' motion to dismiss on this ground.

## C. Failure to State a Claim for Violation of Trade Secrets and Unfair Competition

The Court will address first the NC Defendants' motion to dismiss for failure to state a claim for violation of trade secrets, and then the Prong Defendants' motion to dismiss for failure to state a claim for violation of trade secrets and unfair competition.

## 1. Failure to State a Claim for Trade Secret Misappropriation against NC Defendants

The NC Defendants claim Plaintiffs' trade secret misappropriation claim should be dismissed for three independent reasons: (1) the Complaint does not identify any trade secret with the requisite particularity; (2) the alleged trade secret was a new product idea and therefore was not a trade secret; and (3) the statute of limitations bars the trade secret claim. NC Mot. at 9–17; NC Reply at 4–8. The Court will address each argument in turn.

### a. Plaintiff's Identification of Trade Secrets is Sufficiently Particular

 "Under New York law, to succeed on a claim for the misappropriation of a trade secret, a party must show (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, 14–CV–2796, 2014 WL 4651942, at *4 (S.D.N.Y. Sept. 16, 2014) (Castel, J.) (internal quotation marks and citation omitted). "A trade secret is defined as any formula, pattern, device[,] or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage who do not know or use it," *Id.* (internal quotation marks and citations omitted).

 "To state a claim for misappropriation of trade secrets, a plaintiff must plead facts with sufficient particularity to provide defendants fair notice of what the claim is and the grounds upon which it rests. This requires, at minimum, that the plaintiff generally identify the trade secrets at issue." *Id.* at *5 (internal quotation marks and citations omitted). "[S]pecificity as to the precise trade secrets misappropriated is not required" to defeat a motion to dismiss. *Medtech Prods., Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 789 (S.D.N.Y.2008) (Karas, J.) (citation omitted). Conclusory assertions that something constitutes a trade secret, however, are insufficient. *Alexander Interactive, Inc.*, 2014 WL 4651942 at *5. A complaint must also explain how the claimed trade secret would "constitute information … used in [the plaintiff's] business" and "explain how that [trade secret] would provide [the plaintiff] with an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* (internal quo-

tation marks and citation omitted). Lastly, once a trade secret becomes public—through, for example, issuance of a patent—it is no longer a trade secret. *Id.* (citation omitted).

██ Plaintiffs argue the details of what would eventually become the '486 Patent, including the "carefully preserved data and designs," constitute trade secrets at least through July 12, 2012, the Publication Date of the patent application. Opp. at 21 (citing Complaint at ¶ 62), 23. In the Complaint, Plaintiffs describe Sorias' phone charger prototype as comprising "a makeshift phone cover with two prongs that simulated folding in and out horizontally[;]" the Complaint also includes a photo and blueprints of the prototype. Complaint at ¶¶ 23, 35, 47. According to Plaintiffs, Sorias created the first "protective cell phone case with an integrated wall charger, having the regular thinness of a normal cell phone case, by virtue of both the unique arrangement of specially-made electrical components and the A/C prongs folding in and out horizontally (thus adding almost no additional thickness to the case)." *Id.* at ¶ 24.

The Court finds the Complaint sufficiently identifies the trade secrets at issue to defeat the NC Defendants' motion to dismiss on this basis. "The Court recognizes that [Plaintiffs], for the most part, do not specify the particular trade secrets at issue in this case, but instead categorizes them generally as" data and designs of a specific phone charger with horizontally folding A/C prongs designed by Sorias. *Medtech Prods., Inc.,* 596 F.Supp.2d at 789. Further specificity, however, is not required. *See id.* These facts, though general, give the NC Defendants "fair notice of what the claim is and the grounds upon which it rests." *Alexander Interactive, Inc.,* 2014 WL 4651942 at *5 (internal quotation marks and citation omitted).

Further, the Complaint alleges the phone charger design is the entire basis of Plaintiffs' business and secrecy was seen as key to Plaintiffs' ability to both recoup the costs of the inventive process and monetize the invention in the future, as evidenced by Plaintiffs' alleged insistence on nondisclosure agreements from all potential investors. *See, e.g.,* Complaint at ¶¶ 29, 32; *see also Alexander Interactive, Inc.,* 2014 WL 4651942 at *5. Lastly, the Complaint alleges the NC Defendants signed a non-disclosure agreement before Plaintiffs provided the NC Defendants with the provisional patent application, drawings of Sorias' charger design, and a prototype of the design. *Id.* at ¶ 34. "These allegations make [Plaintiff's] claim for trade secret misappropriation [at least through July 12, 2012, the Publication Date,] *plausible.* The question of whether it will ultimately be successful cannot[, and need not,] be answered at this stage of the case." *Medtech Prods., Inc.,* 596 F.Supp.2d at 790 (citation omitted; emphasis in original).

Accordingly, the NC Defendants' motion to dismiss the trade secret misappropriation claim on this ground is DENIED.

### b. Plaintiffs' Product is a "New Product Idea" and Not a Trade Secret

██ The NC Defendants next argue the trade secret(s) disclosed by Plaintiffs in the Complaint was a "new product idea" which is not protected under New York law and therefore does not provide the basis for a trade secret misappropriation claim. NC Mot. at 10–12.

Under New York law, "a new product idea is not a protected trade secret because, once it is marketed, the idea will no longer be a secret." *Scienton Techs., Inc. v. Comput. Assocs. Int'l Inc.,* 04–CV–2652, 2013 WL 1856653, at *4 (E.D.N.Y. May 1, 2013) (Seybert, J.). "[D]ecisions be New York courts, as well as other federal circuit

courts, have held that [even] a pre-commercialized new product idea is also not a protected trade secret because once it is marketed it will no longer be secret." *Bulldog N.Y. LLC v. Pepsico, Inc.*, 8 F.Supp.3d 152, 177 n. 4 (D.Conn.2014) (Thompson, J.) (citing *Scienton Techs., Inc.*, 2013 WL 1856653 at *4 (collecting cases)). Thus, "although secrecy is a question of fact, courts have held that there can be no trade secret protection, as a matter of law, if the secrecy is necessarily lost when the design or product is placed on the market." *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 498 (S.D.N.Y.2002) (Scheindlin, J.) (internal quotation marks and citations omitted). Courts have found that complicated source code and software programs are trade secrets even when marketed where the code or program architecture was not readily ascertainable; hotel room designs, window designs, window crank designs, and trap designs, however, have been found to not be trade secrets under this rule because, once marketed, these products are open to full public inspection. *See id.* at 498–99 (collecting cases). For example, in *Link-Co*, the District Court for the Southern District of New York found the software architecture at issue was not be a trade secret because "the architecture will be easily ascertainable by the public once the product is marketed" and once it is "reduced to a product, its architecture can never remain secret." *Id.* at 499.

The Court finds the same is true here. Plaintiffs' product is designed to be marketed to the public. *See, e.g.*, Complaint at ¶ 32 (noting Plaintiff's product is designed to be marketed and sold in the United States and abroad). Plaintiff's product, once marketed, will be open to full inspec-

tion by any member of the public. Plaintiff's design, while novel and commendable, is not so complicated as to render it not readily ascertainable. The phone charger design is more akin to that of the window, window crank, or trap, all similarly tangible objects, than it is to complicated source code and software architecture. *See Link-Co, Inc.*, 230 F.Supp.2d at 498–99 (collecting cases). Once the charger is on the market, individuals will be able to see the mechanism by which the A/C prongs fold in and out of the case. Further, the circuitry within the phone case will be open to inspection by any member of the public with sufficient curiosity to pry it open. Like the window, window crank, and trap, the phone charger and its design will not be secret once the product is placed on the market. *See id.*

Plaintiffs' only defense to the NC Defendants' motion to dismiss on this ground is that a 1993 Second Circuit case recognized new product idea might still be protected as a trade secret in its pre-commercialized phase. Opp. at 23–24 (citing *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1177 (2d Cir.1993)). Subsequent case law, however, has settled this question in favor of providing no additional protections for a new product idea in the pre-commercialized phase, *See Bulldog N.Y. LLC*, 8 F.Supp.3d at 177 n. 4 ((citing *Scienton Techs., Inc.*, 2013 WL 1856653 at *4) (collecting cases)). That Plaintiffs' product was at a pre-commercialization phase when the alleged misappropriation occurred, therefore, does not change the Court's analysis. Accordingly, the NC Defendants' motion to dismiss the trade secret misappropriation claim on the basis that it is a "new product idea" is GRANTED.[2]

---

**2.** Plaintiffs attempt to save the trade secret misappropriation claim by re-casting it as one for breach of confidence. Opp. at 24. How-

ever, a breach of confidence claim is a state law claim, and will therefore addressed below

### c. The Statute of Limitations Question is Moot

The Court has dismissed the trade secret misappropriation claim against the NC Defendants on the merits on the basis that Plaintiffs cannot state a trade secret misappropriation claim because the product and design on which the claim is based is a "new product idea." *See* Section Il. C.1.b., *supra.* Accordingly, the Court declines to address the question of whether Plaintiffs' claim is also barred by the statute of limitations as the issue is MOOT.

### 2. Failure to State a Claim for Trade Secret Misappropriation against Prong Defendants

The Prong Defendants move to dismiss Plaintiffs' claim for violation of trade secrets on the basis that Plaintiffs fail to state a claim because (1) Plaintiffs fail to allege the Prong Defendants used a trade secret "as a result of discovery by improper means"; (2) Plaintiffs fail to allege a legally cognizable trade secret; and (3) Plaintiff's trade secret claim is time barred by the statute of limitations. Prong Reply at 1–5, 7–8.

The Court has already determined that Plaintiffs' claim for trade secret misappropriation fails to state a claim because it is a "new product idea" and therefore is not protected as a trade secret. *See* Section Il.C.1.b., *supra; see also Scienton Techs., Inc.,* 2013 WL 1856653 at *4. Accordingly, the Prong Defendants' motion to dismiss Plaintiffs' claim for violation of trade secrets for failure to allege a legally cognizable trade secret is GRANTED. The Court declines to address the Prong Defendants' other challenges to Plaintiffs' claim for trade secret misappropriation as the issues are MOOT.

in Section II.D. with the rest of Plaintiffs'

### 3. Failure to State a Claim for Unfair Competition

The Prong Defendants also move to dismiss Plaintiffs' claim for unfair competition, arguing (1) Plaintiffs have failed to allege the Prong Defendants acted in bad faith to misappropriate Plaintiffs' labor and expenditures; (2) Plaintiffs' New York State law unfair competition claim is preempted by federal patent law; and (3) Plaintiff's unfair competition claim is barred by the statute of limitations. Prong Mot. at 17–19; Prong Reply at 6–7. Because the Court finds that Plaintiff's state law unfair competition claim is preempted by federal patent law, the Court will not discuss the other arguments raised by the Prong Defendants on mootness grounds.

 "Federal Circuit law governs whether federal patent law preempts a state law claim." *Carson Optical, Inc. v. Prym Consumer USA, Inc.,* 11 F.Supp.3d 317, 328 (E.D.N.Y.2014) (Lindsay, Mag. J.) (internal quotation marks omitted) (citing *Ultra–Precision Mfg., Ltd. v. Ford Motor Co.,* 411 F.3d 1369, 1376 (Fed.Cir.2005)). "Federal patent law preempts a state law claim that offers patent-like protection to intellectual property inconsistent with the federal scheme." *Id.* (internal quotation marks and citations omitted).

"[T]o determine whether [an unfair competition claim is] in conflict with federal patent law and accordingly preempted, we assess a defendant's allegedly tortious conduct. If a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, when must be preempted for conflict with federal patent law."

*Id.* (internal quotation marks and citation omitted). "To survive preemption, plain-

state law claims.

tiffs must plead conduct in violation of state law that is separate and independent from its patent law claim." *Id.* (internal quotation marks , and citation omitted). "[P]atent law will not preempt state law claims if such claims include additional elements not found in the federal patent law cause of action and if they are not an impermissible attempt to offer patent-like protection to a subject matter addressed by federal law." *Id.* (internal quotation marks and citation omitted).

In *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, Magistrate Judge Lindsay of the Eastern District of New York determined that federal patent law would preempt a claim of unfair competition under New York law when the "tortious conduct proffered is based upon allegations (i) of patent infringement [and] (ii) that defendants copied an unpatented product[.]" *Id.* at 329. Specifically, the court explained "plaintiffs' unfair competition . . . claim[ ] fail[s] due to the absence of allegations of additional tortious conduct that is separate from the patent law cause of action," *Id.* "Moreover, plaintiffs' allegations of defendants' .bad faith premised on the unlawful copying, misappropriating, knocking off, and stealing of [plaintiffs'] patented designs are insufficient to transform the nature of these claims from patent infringement to an independent common law claim of unfair competition." *Id.* at 331 (internal citation omitted). "Rather, these allegations amplify the scope of plaintiffs' infringement claims by asserting a knowing and willful patent infringement." *Id.* Further, "a state may not, through its law banning unfair competition[,] undermine federal patent rights by prohibiting the copying of an article that is protected by neither a federal patent nor a federal copyright." *Id.* at 335 (internal quotation marks and citations omitted).

The facts here are indistinguishable in principle from those in the *Carson Optical.* As there, Plaintiffs here allege a claim for unfair competition based only on the Prong Defendants' infringement of the '486 Patent or, alternatively, on aspects of the patent that are unprotected by federal patent law because they are not actionable trade secrets. *See* Complaint at ¶ 111; *see also id.* at ¶¶ 4 (alleging Prong Defendants were at all times aware of Plaintiffs' patent and its prosecution), 65, 66 (describing the Prong Defendants' charger as "*exactly* like the sample charger" Plaintiffs' provided to the NC Defendants), 68 (noting Pliner congratulated Sorias on the pending approval of his patent), 69–71 (discussing Prong–Sorias negotiations), 72–76, 80–85 (alleging willful infringement against the Prong Defendants under Count I of the Complaint). Plaintiffs' make no allegations of unfair competition that are "separate and independent from its patent law claim" of infringement. *Carson Optical, Inc.*, 11 F.Supp.3d at 328 (internal quotation marks and citation omitted). As in *Carson Optical*, Plaintiffs' claim of unfair competition is purely based on allegations of patent infringement or copying of an unpatented product. *Id.* at 329, Plaintiffs' unfair competition claim, therefore, is necessarily preempted by federal patent law.

Accordingly, the Prong Defendants' motion to dismiss Plaintiffs' unfair competition claim as preempted by federal law is GRANTED.

### D. State Law Claims Against the NC Defendants are Dismissed

Plaintiffs' remaining claims for breach of contract, rescission of license agreement, and Plaintiff's newly state claim for breach of confidence against the NC Defendants are all based on state law. When the federal claims are dismissed in an action with state law claims based on

supplemental jurisdiction, the state claims should be dismissed as well. 28 U.S.C. § 1367(c)(3); *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 61 (2d Cir.1998). While the dismissal of supplemental state claims is discretionary at this juncture, the usual case " 'will point toward declining jurisdiction over the remaining state-law claims.' " *In re Merrill Lynch,* 154 F.3d at 61 (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). Once a district court has dismissed all claims over which it has original jurisdiction, it still balances the traditional "values of judicial economy, convenience, fairness, and comity" while maintaining the guiding directive that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Kolari v. New York–Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir.2006) (citing *Cohill,* 484 U.S. 343, 350 & n. 7, 108 S.Ct. 614 (1988)) (internal quotation marks omitted). Moreover, "[c]ourts consider their familiarity with the facts, the timing of the case, the number of parties and claims, the amount of discovery, and whether there is ongoing parallel litigation when evaluating judicial economy." *Chenensky v. N.Y. Life Ins. Co.,* 942 F.Supp.2d 388, 392 (S.D.N.Y. 2013) (Pauley, J.) (citing *Allard v. Arthur Andersen & Co.,* 957 F.Supp. 409, 425 (S.D.N.Y.1997) (Mukasey, J.)).

Here, because the Plaintiffs and the NC Defendants are involved in an ongoing state court contract dispute which is pending in New York Supreme Court, the interests of judicial economy will be better served in New York state court. NC Mot. at 1. In accordance with the guiding principle that district courts will not typically maintain state claims once the anchoring federal claims are dismissed, the Court DECLINES to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims against the NC Defendants. *See* 28 U.S.C. § 1367(c)(3).

### E. Issue of Joinder of Prong Defendants is Moot

As the only claims remaining are those against the Prong Defendants for patent infringement of the '486 Patent, the Court finds the issue of joinder with respect to the NC Defendants is MOOT.

### F. Dismissal of Third Amended Complaint and Of Above Claims

Lastly, the Court declines to modify its Scheduling Order of April 9, 2015 (Dkt. 88) to dismiss Plaintiff's Third Amended Complaint with prejudice, or to dismiss the claims of the (Fourth Amended) Complaint discussed herein with prejudice. Accordingly, the NC Defendants' request to modify the Scheduling Order of April 9, 2015 is DENIED and the NC and Prong Defendants' requests for dismissal with prejudice are DENIED.

### CONCLUSION

For the reasons stated herein, the NC Defendants' motion is GRANTED IN PART and DENIED IN PART and the Prong Defendants' motion is GRANTED IN PART and DENIED IN PART. The Clerk of Court is respectfully directed to remove the NC Defendants from the caption and to close the case as to the NC Defendants only.

Further, because there are claims remaining to be tried and at the request of the parties who remain in this action, the case is hereby STAYED until the Court is informed by the parties that the USPTO has ruled on the pending Petition for *Inter Partes* Review of the '486 Patent. Dkt. 95

(Notice of Inter Partes Review); Dkt. 97 at 6 (requesting stay if residual issues remain); Dkt. 98 at 9 (same).

**SO ORDERED.**